IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Kenneth J. Upthegrove, | : | |
| | : | Case No. 1:08-cv-835 |
| Plaintiff, | : | |
| | : | Chief Judge Susan J. Dlott |
| v. | : | |
| | : | ORDER GRANTING IN PART AND |
| Great Oaks Institute of Technology | : | DENYING IN PART DEFENDANT'S |
| and Career Development Board of Education, | : | MOTION FOR SUMMARY |
| | : | JUDGMENT |
| Defendant. | : | |

This matter is before the Court on Defendant's Motion for Summary Judgment (doc. 9). Plaintiff Kenneth Upthegrove is suing his former employer, Defendant Great Oaks Institute of Technology and Career Development, for race and age discrimination and for retaliation. For the reasons that follow, the Court will **GRANT IN PART AND DENY IN PART** Defendant's motion.

## I. BACKGROUND

### A. Factual History

The following facts were agreed upon by the parties in their Proposed Undisputed Facts and Responses thereto (docs. 10, 28, 30-1) except where specifically noted otherwise.

Upthegrove (DOB 1957) is an African-American male who was employed by Great Oaks from 1995 to 2007. Great Oaks is a vocational school system for high school juniors and seniors with multiple campuses. (Culbert Dep. 19-25.) Upthegrove was assigned to teach construction subjects to high school students who attended the Laurel Oaks campus in Wilmington, Ohio. The subjects that Upthegrove taught included carpentry, electricity, and plumbing. (Upthegrove

1

Dep. 136.) Upthegrove was the only African-American teacher at Laurel Oaks.

### 1. 1998–1999 Through 2002–2003 School Years

Maggie Hess was the Dean of Instruction at Laurel Oaks from 1993 through 2003, and as such she was Upthegrove's supervisor. Hess authored performance evaluations and memoranda for Upthegrove from 1998 through 2003. (*Id.* Exs. 4-11.) She complimented Upthegrove for his work in several areas, including his commitment to students, student retention rates, classroom management, and his relationship with parents and staff. (*Id.*) In 2002, Hess gave Upthegrove the highest possible rating in twelve of thirteen categories on an "Observation Form." (*Id.* Ex. 9.).

However, during that multi-year period, Hess repeatedly identified areas of concern for Upthegrove, including lesson plans, industry visits, advisory committee meetings, and written reports. For example, Hess criticized Upthegrove for his failure to submit lesson plans. (*Id.* Exs. 4-11.) To complete his weekly lesson plans, Upthegrove made minor modifications to and then re-used his lesson plan from the previous year. The modifications included adding dates or updating numbers in the plans. It took Upthegrove one half-hour to complete his lesson plan for the next week.

On September 29, 2000, Hess authored a "Plan of Action" for Upthegrove. (*Id.* Ex. 8.) A Plan of Action is not a discipline document equivalent to a reprimand; instead, it is designed to help an instructor fulfill his duties. Upthegrove does not believe that Hess was motivated by his race when she created the Plan of Action for him.

In 2002, Upthegrove was instructed to utilize National Center for Construction Education and Research ("NCCER") materials for teaching his students. (Upthegrove Dep. at

2

146-47.) NCCER is a "tool to deliver [Great Oaks'] board-adopted curriculum or course of study." (Spears Dep. 86.) NCCER materials for each subject are broken into modules and students are tested on each module within a subject area. (Upthegrove Dep. 162-64.) The NCCER modules involve more "knowledge-based competencies" than "hands-on" activities. (Culbert Dep. 112; *see also* Spears Dep. 100.) Students who pass NCCER tests qualify for transferable college credits or are entitled to a higher rank of pay. (Wilkin Dep. 76; *see also* Upthegrove Dep. 142-43. ) Hess noted on Upthegrove's performance evaluations beginning in 2002 that he needed to implement NCCER. (Upthegrove Dep. Exs. 9-11.)

Upthegrove testified that he started to use NCCER materials in 2002, but he admits that he did not fully implement NCCER until the 2006–2007 school year. (*Id.* at 147-48.) He testified that he was unable to fully implement NCCER initially because the materials were too difficult for his students and because he lacked sufficient time. (*Id.* at 142-48, 154.) Specifically, Upthegrove testified that some NCCER materials were written at a college reading level, but that up to one-half of his students read below the eighth grade level. (*Id.* at 136-37, 311-12.) Also, members of Upthegrove's construction business and industry advisory committee did not approve of NCCER, but rather favored more teaching of electricity. (Culbert Dep. 102-03; Spears Dep. 88-89.) Upthegrove, as the instructor, was responsible for creating the advisory committee for his program. He was criticized by Laurel Oaks administrators in the final years of his employment for using an advisory committee comprised of mostly electricians in violation of the membership guidelines set forth in the business advisory committee handbook. (Culbert Dep. 102-03, 119-20.)

Upthegrove testified Hess understood the reasons why he could not fully implement

3

NCCER in 2002. (Upthegrove Dep. 150-52.) He notes that Hess commented in an April 2003 evaluation that he should have "[i]ncreased use of the NCCER materials." (*Id.* at 150-52 & Ex. 11.) Upthegrove contends that Hess's comment implies that full implementation was not feasible.

### 2. 2003–2004 and 2004–2005 School Years

In December 2004, the new Dean of Instruction at Laurel Oaks, Ron Webber, gave Upthegrove the highest possible mark, "proficient," in every category on an Observation Form, but also stated that Upthegrove should "[m]ake sure that [he] commences the use of the new NCCER curriculum in instruction and that the students take the tests at the conclusion of the unit." (*Id.* Ex. 12.)

### 3. 2005–2006 School Year

Beginning with the 2005–2006 school year, Mitchell Culbert (DOB 1954) became the Dean of Instruction at Laurel Oaks and Dave Spears (DOB 1963) became a curriculum and instructional specialist ("C&I specialist"). Both men are Caucasian. Culbert was Upthegrove's only supervisor with the authority to evaluate his performance and to recommend renewal or non-renewal of his employment contract to the President of Great Oaks. (*Id.* at 127; Culbert Dep. 18, 56.) A C&I specialist is a support team member who helps develop the curriculum. (Spears Dep. 21.) Spears worked with career technical teachers such as Upthegrove on all four of Great Oaks' campuses. He reviewed lesson plans and recommended corrections. Spears also conducted safety examinations in the labs.

At the start of the 2005–2006 school year, Upthegrove took four half-days off of school following the birth of his son. Upthegrove testified that Culbert and he "clashed" about the time

4

he took off. (Upthegrove Dep. 112-13.)

Culbert and Spears continued to counsel Upthegrove to implement NCCER. Upthegrove's NCCER certification lapsed during the 2005–2006 school year because he had not submitted NCCER test result forms ("Form 200s") for a period of two years. In June 2005, Spears wrote in "Professional Growth Goal Worksheet" that one of Upthegrove's goals should be to "fully implement NCCER modules into construction trades instruction." (*Id.* Ex. 13.) In December 2005, Culbert wrote on an Observation Form that Upthegrove needed to "recertify on NCCER and start using NCCER as part of [his] overall curriculum." (*Id.* Ex. 14.)

Prior to the 2005–2006 school year, Upthegrove did not administer the NCCER tests to his students. (*Id.* at 261-63.) Upthegrove told Spears that he did not think his students could pass the NCCER test, but he did not provide Spears with any objective evidence to support his belief. (Spears Dep. at 89-90.) Upthegrove began administering the tests during the 2005–2006 school year when the students began to purchase the NCCER workbooks. (Upthegrove Dep. 159-60.) Students had not been required to purchase the workbooks prior to that year. (*Id.*)

Despite the fact that Upthegrove began to administer the NCCER tests during the 2005–2006 school year, he did not submit any Form 200 test results that school year. He testified at his deposition that he did not submit the Form 200s because he did not think it would be beneficial to his students to post a high fail rate. (Upthegrove Dep. 308, 314.) Because Upthegrove did not submit the forms, Spears could not determine if the testing had been conducted without reviewing individual student's files.

In January 2006, Upthegrove was counseled again in written evaluations to use NCCER. (*Id.* Exs. 15-16.) On the other hand, Upthegrove was given high marks in the evaluations for his

5

classroom control and teaching style. (*Id.*) Upthegrove submitted written statements rebutting the critical remarks in the evaluations. (*Id.*)

The evidence suggests that Upthegrove and Spears had a difficult working relationship. Upthegrove was the only African-American teacher who Spears advised in his role as the C&I specialist. Upthegrove testified that he told Culbert in February 2006 that Spears did not treat him fairly because of his race. (*Id.* at 285-89.) Upthegrove did not volunteer any specific reason for his belief about Spears to Culbert. (*Id.*) Culbert told Upthegrove that he did not agree. (*Id.*) On an unspecified date, Spears and Upthegrove had a confrontation after Spears noted on a safety inspection report that he observed students working without Upthegrove's supervision. Upthegrove confronted Spears in front of another teacher, used the word "testicles," and said something along the lines that Spears "didn't have testicles big enough to tell him upfront about it." (Spears Dep. 53.)[1]

Also in February 2006, Culbert created a second Plan of Action for Upthegrove. (Upthegrove Dep. Ex. 18.) Areas noted for improvement included "[p]roper lesson planning and submittal and use of NCCER" and "[s]ubmitting required documentation in accordance with

---

[1] Lynne Weintrub, a school counselor at Laurel Oaks, told Upthegrove that he should "watch his back" in regard to Spears. (Weintrub Dep. 17.) Weintrub believed that Spears treated African-Americans differently and that he was a racist, but she admitted that her belief was based on "personal feelings" and "nothing concrete." (*Id.* at 17, 38.) She further testified that she had no basis to believe that Spears would have evaluated Upthegrove differently on the basis of his race.

Likewise, Upthegrove alleges that another colleague, Melinda Walker, testified that he was being mistreated on the basis of his race. The Court has reviewed Walker's testimony. Walker testified that she believed that Upthegrove was being treated unfairly; however, she stated that she did not believe that he was being mistreated on the basis of his race. (Walker Dep. 40, 68-69.)

District policy and procedures." (*Id.*)

### 4. Plaintiff Files Charge of Discrimination During 2005–2006 School Year

On March 15, 2006, Upthegrove filed a charge of race discrimination against Great Oaks with the Ohio Civil Rights Commission. (*Id.* Ex. 21.) Upthegrove did not allege age discrimination in the OCRC charge. He testified at his deposition that the only employees at Great Oaks who were motivated to take actions against him on the basis of his race were Spears and Culbert. Upthegrove did not identify Spears or Culbert by name in the OCRC charge, but he did refer to his principal and supervisor and he did identify the February 21, 2006 Plan of Action as being an indication of Great Oaks' discriminatory practices. (*Id.*)

Upthegrove did not allege in the OCRC discrimination charge that Culbert or Spears made racially insensitive or derogatory remarks. When questioned at his deposition about whether Culbert made racially derogatory remarks, Upthegrove stated that when a Jewish employee called in sick, Culbert made a comment about it being Jewish holiday. (*Id.* at 35-45.) He also testified that Culbert said that trying to help a particular African-American student would be a waste of time. Upthegrove admitted that Culbert did not say that it would be a waste of time to help the student because she was African-American. (*Id.*) Upthegrove also testified that Spears never used racially insensitive language in his presence. (*Id.* at 57.) Finally, Upthegrove testified that no one at Great Oaks made any comments that were derogatory towards him because of his age nor did they make any comments that they preferred younger workers.

Dr. Michelle Means-Walker (DOB 1952), the Director of Human Resources for Great Oaks, received a copy of the charge and she turned it over to Great Oaks' legal counsel. (Means-

Walker Dep. 28-29.) She also performed what the Court would describe as an informal investigation. She reviewed Upthegrove's performance evaluations. (*Id.* at 34-35.) She spoke to Culbert and to Dr. Roberta White, the President of Great Oaks, about the charge. (*Id.* at 29-36.) She did not speak to Upthegrove about the charge. (*Id.* at 36.)

Culbert told Dr. Means-Walker that he was shocked by the charge. (*Id.*) That same month, Culbert and Dr. Means-Walker discussed Upthegrove's performance issues. (Culbert Dep. 54-56.) Culbert sent an email to Dr. Means-Walker on March 26, 2006 stating his intention to recommend that Upthegrove's contract be renewed. (Doc. 27-1 Ex. D.) However, Culbert also stated that Upthegrove had not redressed nor made any attempt to redress his performance deficiencies:

> It should be noted that his Plan of Action dated 2/21/06 stated that unless he improved on those items that he would not be recommended for renewal for the 2006–2007 school year. We will need to talk about how to word the evaluation now that he has still not improved nor made any attempt to do that.

(*Id.*) On March 30, 2006, approximately two weeks after Upthegrove filed the charge of discrimination, Culbert formally recommended that Upthegrove's employment contract be renewed for the 2006–2007 school year. (Upthegrove Dep. 322-23; Culbert Dep. 54-56.) Dr. White also recommended renewal. The Board of Directors then renewed Upthegrove's contract for the 2006–2007 school year.

Upthegrove testified that sometime after April 2006, Culbert asked him why he filed the OCRC charge, but he did not respond to Culbert's question. (Upthegrove Dep. at 56-57, 122-23.) Culbert denied at his deposition that he asked Upthegrove about the charge. (Culbert Dep. 52.)

Upthegrove also testified that at an unspecified time, Culbert told him that he was going

8

to start a "paper trail" on him. (Upthegrove Dep. 125-26.) Culbert denies telling Upthegrove that he was going to make a "paper trail" on him. (Culbert Dep. 75.)

     **5.     2006–2007 School Year and Non-Renewal**

Culbert created a third Plan of Action for Upthegrove dated August 21, 2006, around the start of 2006–2007 school year. (Upthegrove Dep. Ex. 23.) Culbert identified the following as areas of concern: submitting timely lesson plans, integrating the NCCER materials, submitting timely agendas and minutes for the advisory committee meetings, and using technology to submit required documentation in a timely manner. (*Id.*) Upthegrove taught and tested his students using the NCCER materials during the 2006–2007 school year. (Spears Dep. 92.) He also began to submit the NCCER test results using the Form 200s in November 2006. However, Spears and Culbert believed that Upthegrove continued to teach units on electrical and plumbing before he had completed the required NCCER materials. (*Id.*; Culbert Dep. 68-69, 123-24.) Spears stated that Upthegrove was teaching two quarters of carpentry, one of electricity, and one of plumbing when his focus was supposed to be on construction framing and finish through use of NCCER. (Spears Dep. 92-93.)

That fall, Culbert issued a series of memoranda entitled "Negligence in Performing Essential Duties of a Career Technical Instructor," outlining areas in which Culbert believed Upthegrove's performance remained deficient. (Upthegrove Dep. Exs. 24-27.) Upthegrove denied the accusations in the write-ups. Culbert completed a mid-term evaluation dated December 17, 2006 which stated that Upthegrove had failed to meet the expectations identified in the August 2006 Plan of Action in order to have his contract renewed for the following school year. (*Id.* Ex. 28.)

9

Regarding lesson plans, Upthegrove alleged Spears made corrections to and stopped approving the weekly lesson plans he submitted in the 2006–2007 school year, even though the plans were substantially similar to those Spears had approved the previous school year. (*Id.* at 182-83, 188, 248, 273-74, 277-78 & Exs. 15, 16.) Upthegrove disputed that he had anything more than occasional difficulties with submitting his lesson plans on time. (*Id.*) Rather, he stated that Spears would insist that he make minor corrections to his lesson plans, which resulted in a late date being entered automatically on the lesson plans when he made the correction. (*Id.*)

Regarding safety inspections, Culbert completed a "Safety Inspection" for Upthegrove in November 2006 marking several items as needing "some attention" or needing "immediate attention," as opposed to being satisfactory. (Doc. 27-1 Ex. F.) Spears then completed Safety Inspections for Upthegrove dated January 2007 and March 2007 each with multiple items needing "some attention" or "immediate attention." (*Id.*) Upthegrove disagreed generally with the negative assessments made on the safety inspections that he received his last two years of employment, but he did not identify at his deposition any specific reports nor specific negative assessments with which he found fault. (Upthegrove Dep. 97-99.)

In December 2006, Upthegrove met with Dr. White and told her that he was being mistreated on the basis of his race. In January 2007, Upthegrove met with Dr. Means-Walker and told her that he believed he was being mistreated because of his race. (*Id.* at 212-13.) He believes that he told Dr. Means-Walker that Culbert and Spears were racists. (*Id.*) Dr. Means-Walker was not aware of any other complaints about Culbert treating African-Americans differently. She was not aware of Culbert or Spears making race-based comments. (Means-Walker Dep. 34, 66-67.)

10

In March 2007, Culbert accused Upthegrove of being insubordinate. Upthegrove testified that, in the presence of other employees, Culbert pointed a finger at his face and told him that his employment contract would not be renewed for the next school year. (Upthegrove Dep. 220-22; Hatfield Dep. 16-17.) Culbert testified that he believed Upthegrove was insubordinate and that he told Upthegrove that he would not recommend renewal. (Culbert Dep. 66-67.) He testified that he recalls conversations between them getting "heated" but did not remember pointing a finger in Upthegrove's face. (*Id.*) According to Culbert, Upthegrove's insubordination concerned the fact that he continued to teach electricity even after being instructed by Culbert to complete the NCCER materials first. (*Id.* at 123-25.)

Upthegrove took a leave of absence from March 23, 2007 through April 1, 2007 for high blood pressure. (Upthegrove Dep. 433-34 & Ex. 40.) Culbert did not believe the absence was justified and he accused Upthegrove in writing of not teaching class to thwart Culbert's attempts to complete his final observation report. (Culbert Dep. 76-80; Upthegrove Dep. Exs. 34, 35.) Culbert continued to question whether the absence was justified even after reviewing a medical excuse for the absence from Upthegrove's physician. (Culbert Dep. 76-80.)

On April 2, 2007, Culbert completed Upthegrove's final evaluation and recommended that Upthegrove's contract not be renewed for the 2007–2008 school year. (Upthegrove Dep. Ex. 36.) Culbert testified that he recommended non-renewal because Upthegrove did not follow his Plan of Action and was insubordinate. (Culbert Dep. 123-34.)

Also on April 2, 2007, Dr. White advised Upthegrove that she would recommend to the Board of Directors that Upthegrove's contract not be renewed. (Upthegrove Dep. Ex. 37.) Upthegrove appeared before the Board on April 11, 2007 and the Board voted not to renew his

11

contract. Upthegrove testified that no Board members mistreated him because of his race nor retaliated against him because he had filed the OCRC charge.

Upthegrove was replaced at Laurel Oaks by Tom Bixler, a Caucasian male who was older than Upthegrove. Bixler had been teaching at Live Oaks. No one was hired to fill Bixler's position at Live Oaks after he transferred to Laurel Oaks.

### 6. Alleged Comparators

Defendant contrasts Upthegrove's experience with implementing the NCCER curriculum with the experience of Shawn Wilkin, the only other instructor at Laurel Oaks required to implement the NCCER. Wilkin began conducting NCCER testing in 2004. He began submitting the Form 200 test results during the 2004–2005 school year, two years prior to Upthegrove. Also, Wilkin's supervisor noted positively that he kept his lesson plans up to date.

On the other hand, Upthegrove contrasts himself to three younger, Caucasian teachers whom he believes were treated more favorably. For example, he alleges that Joe Clements, an aviation teacher, was not criticized for not failing to submit lesson plans. (Upthegrove Dep. 89-90; Doc. 27-1 Ex. B.) However, Upthegrove's testimony about what Clements told him about his lesson plans is hearsay. (Upthegrove Dep. 89-90.) Clements was never supervised by Culbert or Spears. (Clements Dep. 9.)

The two other teachers to whom Upthegrove compares himself, Adam Elza (DOB 1958) and Clem Skinner (DOB 1965), did not teach at Laurel Oaks. (Spears Dep. 27, 29.) Elza and Skinner were both supervised by Spears in his role as the C&I specialist. Spears testified that there were incidents where Elza and Spears submitted late or incomplete lesson plans, but that such behavior was not habitual. (*Id.* at 72-73, 76-77; Doc. 27-1 Ex. G.) Spears also testified that

12

Elza had a problem with NCCER one year when he failed to submit one set of quarterly Form 200s prior to the end of the school year as required. Spears spoke to Elza and he submitted the Form 200s after the school year had ended. (*Id.* at 96-97.) Similarly, Spears testified that Skinner did not complete teaching or testing all of the required NCCER modules one year and that he submitted his quarterly Form 200s late, but had caught up by the end of the year. (*Id.* at 97-98.) Finally, Spears testified that he had to ask each of Elza and Skinner to ramp up their advisory committees. (*Id.* at 70.)

Upthegrove asserts that he complained to Culbert that other employees were being treated more favorably, but Culbert replied (as paraphrased by Upthegrove), "I don't care what anybody else is doing." (Upthegrove Dep. 91.)

**B.     Procedural Background**

Upthegrove filed a Complaint against Great Oaks in this Court on November 28, 2008 alleging the following causes of action:

(1)     Race Discrimination – Title VII;
(2)     Race Discrimination – Ohio Revised Code ("O.R.C.") Chapter 4112
(3)     Age Discrimination – ADEA;
(4)     Age Discrimination – O.R.C. Chapter 4112;
(5)     Retaliation – Title VII; and
(6)     Retaliation – O.R.C. Chapter 4112.

(Doc. 1.) Subsequently, Great Oaks filed an Answer denying liability on the alleged causes of action. Great Oaks now seeks summary judgment as to all claims. The pending motion is ripe for adjudication.

**II.     STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGMENT**

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if "there is no genuine issue as to any material fact" and "the movant is

13

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). On a motion for summary judgment, the movant has the burden of showing that no genuine issues of material fact are in dispute, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986).

The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). The nonmoving party must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The Court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

## III. ANALYSIS

### A. Race Discrimination and Retaliation

Title VII prohibits an employer from discriminating against an employee, with respect to the terms, conditions, and privileges of one's employment, on the basis of race. 42 U.S.C. § 2000e-2(a). State law prohibits the same conduct, O.R.C. § 4112.02(A), "and is generally construed in identical fashion to Title VII." *Shoemaker-Stephen v. Montgomery Cty. Bd. of*

14

*Comm'rs*, 262 F. Supp. 2d 866, 874 (S.D. Ohio 2003); *see also Plumbers and Steam Fitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 66 Ohio St. 2d 192, 196, 421 N.E.2d 128 (1981). Title VII and the Ohio Revised Code also prohibit retaliating against an employee because he has opposed an illegal discrimination practice or has filed a discrimination charge. *See* 42 U.S.C. § 2000e-3(a); O.R.C. § 4112.02(I).

Upon consideration of the totality of the evidence, the Court finds that Great Oaks is not entitled to summary judgment on the race discrimination or retaliation claims. Upthegrove easily establishes a prima facie case of race discrimination with evidence that he is an African American, was qualified for his job, was subjected to an adverse action in the form of non-renewal of his contract, and was replaced by a Caucasian male. *See Peltier v. United States*, 388 F.3d 984, 987 (6th Cir. 2004) (setting forth the standard); *Carter v. Univ. of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003) (same). Similarly, Upthegrove puts forth evidence sufficient to establish a prima facie case of retaliation: he took protected action by filing the charge of discrimination, Great Oaks was aware that he filed the charge, Great Oaks chose to not renew his contract approximately one year after he filed the discrimination charge, and there was causal connection between the protected act and the adverse action. *See Lindsay v. Yates*, 578 F.3d 407, 418 n. 10 (6th Cir. 2009) (setting forth the standard). The evidence of a causal connection includes Culbert asking Upthegrove why he filed the discrimination charge, Culbert putting Upthegrove on a third Plan of Action at the start of the 2006–2007 school year despite renewing his contract, and Culbert telling Upthegrove that he was going to start a "paper trail" on him.

Great Oak's proffered non-discriminatory reason for terminating Upthegrove's employment is that he was insubordinate and failed to meet performance expectations.

However, Upthegrove has submitted sufficient evidence of pretext to create a disputed issue of material fact whether the Great Oaks instead was motivated by Upthegrove's race or by a desire to retaliate against Upthegrove for filing the charge of discrimination. This evidence includes, but is not limited to, testimony and documents that Upthegrove implemented NCCER over time consistent with his supervisors' expectations prior to the 2005–2006 school year, that Upthegrove was terminated after he had met objective benchmarks for implementing NCCER—such as administering NCCER tests and submitting test results via the Form 200s—during the 2005–2006 and 2006–2007 school years, and that Culbert evidenced a personal animosity towards Upthegrove. Evidence of Culbert's animosity towards Upthegrove includes but is not limited to Culbert allegedly threatening to create a "paper trail" on Upthegrove and Culbert refusing to credit a physician's excuse justifying Upthegrove's medical absence. A reasonable jury could conclude based on Upthegrove's evidence that Great Oaks' stated reasons were either not the actual motivation for his termination or were not sufficient to motivate his termination. *See Chen v. Dow Chemical Co.,* 580 F.3d 394, 400 & n.4 (6th Cir. 2009)(explaining pretext standard).

For all these reasons, the Court will **DENY** summary judgment to Great Oaks on the race discrimination and retaliation claims.

**B.  Age Discrimination**

Upthegrove also asserts that Great Oaks discriminated against him on the basis of his age in violation of the ADEA, 29 U.S.C. § 621 *et seq.*, and O.R.C. chapter 4112. The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or

privileges of employment, because of such individual's age." 29 U.S.C. § 623(a). Again, Ohio law parallels the ADEA and the Court will analyze the state and federal age discrimination claims together. *See Ercegovich v. Goodyear Tire and Rubber Co.*, 154 F.3d 344, 357-58 (6th Cir. 1998); *Whitt v. Lockheed Martin Utility Serv., Inc.*, 209 F. Supp. 2d 787, 792 (S.D. Ohio 2002).

Unlike Upthegrove's age discrimination and retaliation claims, his age discrimination claim fails because he has not establish a prima facie case. A plaintiff establishes a prima facie case of age discrimination with evidence that (1) that he was a member of a protected age class; (2) that he suffered an adverse employment action; (3) that he was qualified for the position he held; and (4) that he was replaced by a younger worker or was treated differently than similarly situated younger employees. *See Bender v. Hecht's Dept. Store*, 455 F.3d 612, 620 (6th Cir. 2006) (setting forth the standard); *Cichewicz v. UNOVA Indus. Auto. Sys., Inc.*, No. 02-1831, 2004 WL 291178, at *2 (6th Cir. Feb. 12, 2004) (same).

Upthegrove has not established the fourth factor. Upthegrove cannot establish the fourth factor with the fact that he was replaced by Tom Bixler because Bixler is older than Upthegrove. Instead, Upthegrove asserts that he was treated differently than three other Great Oaks' teachers—Clem Skinner, Adam Elza, and Joe Clements—who each allegedly had similar performance issues with submitting lesson plans, utilizing the NCCER, and/or with safety inspections. The Court has reviewed the evidence concerning the alleged comparators and finds it to be insufficient to help establish Upthegrove's prima facie case.

Clements was not similarly situated as a matter of law to Upthegrove because he neither taught construction nor was he supervised by Spears or Culbert. Additionally, Upthegrove has

17

not identified Clements' age, so the Court cannot determine whether he was a younger worker. Likewise, Upthegrove cannot prove a prima facie case with a comparison to Elza because both men are over forty and Elza is only approximately one year younger than Upthegrove. The Sixth Circuit has held that "in the absence of direct evidence that the employer considered age to be significant, an age difference of six years or less between an employee and a replacement is not significant." *Grosjean v. First Energy Corp.*, 349 F.3d 332, 340 (6th Cir. 2003).

Skinner is approximately eight years younger than Upthegrove. Spears testified without contradiction that Skinner had "rare" problems with submitting late lesson plans and that he had to ask Skinner to "ramp up" his business council. Spears also testified that Skinner did not complete the all of the NCCER modules and therefore was not able to test the students on the modules. However, these situations with Skinner occurred during an approximate one-year period in 2008, the year after Upthegrove had been terminated. (Spears Dep. 70-73, 97-98.) Upthegrove allegedly had recurring problems over the course of multiple school years. Also, there is no evidence that administrators believed that Skinner acted in an insubordinate manner. Finally, Skinner did not teach at Laurel Oaks and was not supervised by Culbert, the Dean of Instruction with the sole authority to make the initial recommendation to not renew Upthegrove's contract. The Court finds that Skinner is not similarly-situated to Upthegrove in all relevant respects for purposes of establishing Upthegrove's prima facie case of age discrimination. Whether or not Spears criticized Skinner for the alleged deficiencies occurring in 2008 at a different campus is not relevant to establish Culbert's motivations in 2007 for not recommending non-renewal of Upthegrove's contract to teach at Laurel Oaks.

The Court will **GRANT** summary judgment to Great Oaks on Upthegrove's age

18

discrimination claims.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (doc. 9) is **GRANTED IN PART AND DENIED IN PART**. Summary judgment is awarded to Great Oaks as to Upthegrove's age discrimination claims only. Upthegrove will be permitted to proceed to trial on his race discrimination and retaliation claims.

IT IS SO ORDERED.

       ___s/Susan J. Dlott_____
       Chief Judge Susan J. Dlott
       United States District Court